IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY TRUBEGA, | ) | CASE NO. 1:20CV1406 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE SARA LIOI |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Timothy Trubega ("Trubega") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for supplemental security benefits ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

**I. Procedural History**

Trubega filed an application for SSI on February 6, 2018, alleging a disability onset date of August 1, 2015. Tr. 156. He alleged disability based on the following: asthma, closed torus fracture of the distal end of the left fibula, rapid atrial fibrillation, saphenous nerve neuropathy left side, and dislocation of the left patellofemoral joint. Tr. 193. After denials by the state agency initially (Tr. 81) and on reconsideration (Tr. 92), Trubega requested an administrative hearing. Tr. 103. A hearing was held before an Administrative Law Judge ("ALJ") on June 10, 2019. Tr. 56-70. In his June 25, 2019, decision (Tr. 37-46), the ALJ determined that there are

1

jobs that exist in significant numbers in the national economy that Trubega can perform, i.e., he is not disabled. Tr. 45-46. Trubega requested review of the ALJ's decision by the Appeals Council (Tr. 154) and, on April 30, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Trubega was born in 1992 and was 25 years old on the date he filed his application. Tr. 45. He completed twelfth grade. Tr. 45.

### B. Relevant Medical Evidence

On May 2, 2016, Trubega visited orthopedic specialist Dr. Leland, M.D., reporting a long history of left knee problems. He stated that he had dislocated his kneecap multiple times and had had two surgeries. He complained of abnormal sensation in his leg (it sometimes felt hot, cold, or wet), weakness, and an inability to bend his knee due to pain. His symptoms were getting worse. Tr. 239. An MRI of his left knee was taken on May 12 and showed stable thinning of the medial patellar facet articular cartilage and postsurgical changes in the distal quadriceps area. Tr. 238. He also had an EMG study of his left knee done. Tr. 236.

Trubega followed up with Dr. Leland on June 7, 2016. Tr. 235. Upon exam, he had a full range of motion in his left knee and tenderness everywhere but mostly over the anterior aspect of his leg. Tr. 236. His patella "translates to the fourth quadrant without solid endpoint," he had positive patellar apprehension and positive patellar grind, and a stable knee upon varus and valgus stress. Tr. Tr. 236. Dr. Leland commented that the EMG test showed slowing of his saphenous nerve and the MRI showed intact cartilage undersurface of the patella with a normal measurement. Dr. Leland recommended reconstruction surgery of the MPFL (medial

patellofemoral ligament) of the left knee. Tr. 238.

On June 23, 2016, Trubega underwent MPFL reconstruction surgery on his left knee. Tr. 277. On July 5, he saw Dr. Leland for a follow up. He was doing well and had no complaints. Tr. 232. On August 2, he had another follow up with Dr. Leland; overall he was doing well, he had been wearing his knee brace and doing physical therapy, and he was not having any problems. Tr. 229.

On September 13, 2016, Trubega saw Dr. Leland for his three-month post-operative visit after his MPFL reconstruction. Tr. 226. He reported doing well and seeing improvement, although he still felt some clicking in his patella. Upon exam, he had a full range of motion in his knee with no effusion and his patella translated into the second quadrant with a very solid endpoint. Tr. 228. His diagnoses were dislocation of the patellofemoral joint and instability of the left knee, and Dr. Leland's impression was that he was doing very well, he was to continue to work on strengthening, to wear his stabilizing brace whenever active, and to return in a few months.

On December 13, 2016, Trubega returned to Dr. Leland for a follow up. Tr. 223. He reported that his knee had not given out on him, he had returned to most of his normal activities and had been wearing his brace for most activities, and he reported pain over the medial and anterior aspect of his patella. Upon exam, he had normal reflexes and sensation, a positive patellar grind but negative patellar apprehension, his patellar tracked the second quadrant with a solid endpoint, he was tender to palpation over the medial joint line, he had a full range of motion with pain on extension, and was neurovascularly intact. Tr. 225. Dr. Leland advised he begin to transfer out of his brace and continue to strengthen his knee and leg. He was to follow up on an as-needed basis.

On March 13, 2018, Trubega completed a function report. Tr. 179-186. He reported difficulty standing for long periods of time and sitting too long and that his leg gave out without warning. He had difficulty using his left arm and hand, such as when typing and lifting heavy objects. He reported that he used a cane to get up at times, he tried to help around the house with a great deal of difficulty, and he mainly kept his leg elevated and used heat on it when it got too cold.

On April 11, 2018, an x-ray of Trubega's left knee showed mild patellofemoral joint space reduction, moderate swelling suggested, and no fracture. Tr. 272.

On August 18, 2018, Trubega returned to Dr. Leland reporting that he had not been doing well over the last few months. Tr. 277. He had pain with motion in his knee and he had not been able to work due to the pain. He denied re-injuring his knee. He also complained of elbow pain since he was 13 years old, when he had been diagnosed with medial epicondyle fracture treated with a sling that "went on to nonunion." He had not had treatment for his elbow since then. Upon exam, he had normal reflexes and sensation. Tr. 278. His left knee was painful with range of motion and he was tender over the lateral trochlear groove. He had a palpable bundle of the reconstructed MPFL "but it appears now to be either stretched or torn from the femoral attachment, as his patella now translates to the third quadrant without a solid endpoint. He had positive patellar grind and apprehension and a stable knee on varus and valgus stress without pain. His left elbow had subjective numbness and notable weakness with finger flexion strength, although his sensation and range of motion was intact and without pain. Tr. 278. An x-ray of his left elbow showed a medial epicondyle fracture nonunion and an x-ray of his left knee showed prior tunnels from MPFL reconstruction but no other acute findings. Dr. Leland opined that some type of injury occurred to cause re-injury to the MPFL. Tr. 279. After a long discussion,

Trubega elected to undergo conservative treatment to start, and Dr. Leland placed him in a brace and prescribed physical therapy for strengthening. Dr. Leland noted that the threshold for operatively treating him was low, given his non-functional status and patellar instability. He also ordered an elbow MRI and referred him to an elbow specialist, Dr. Malone, for further treatment.

On September 10, 2018, Trubega saw Dr. Malone, M.D., for left elbow pain and hand numbness. Tr. 330. Trubega reported having injured his elbow in 2006 when he fell from his bicycle. He reported chronic elbow pain, numbness and tingling in the middle and small fingers of his left hand, occasionally dropping things, and pain with forced attempt to use his arm or hand. Upon exam, he had no elbow instability, full range of motion, tenderness over the medial epicondyles, he could produce an audible click with certain manipulations of his elbow, he had excellent wrist and finger flexion strength but pain with resisted flexion, a positive Tinel sign, diminished sensation in the ulnar aspect of his hand, no atrophy, and good grip strength. Dr. Malone reviewed Trubega's elbow MRI and his impression was chronic medial epicondyles avulsion fracture without elbow instability but with persistent ulnar nerve symptoms. Tr. 330-331. He recommended fragment excision with muscle repair or reattachment and advised Trubega have a follow up with his cardiologist first, as he had developed an arrhythmia after his most recent surgery.

On September 25, 2018, Trubega visited Dr. Leland's office for a follow up for his left knee pain. Tr. 325. He had been going to physical therapy and wearing his knee brace with no improvement. His knee was sore most of the time and he was having difficulty going up and down stairs. It was decided that Trubega would undergo surgery on his knee, to occur months after his elbow surgery, scheduled that week, due to the fact that he would be unable to use crutches while recovering from elbow surgery. Tr. 327.

On September 27, 2018, Trubega had left elbow surgery: excision medial epicondyle fragment repair and ulnar nerve decompression. Tr. 334.

On October 10, 2018, Trubega had an MRI of his left knee, which showed a mild degenerative change of his knee and prior surgery at the medial patellar ligament. Tr. 323-324.

On November 6, 2018, Trubega returned to Dr. Leland to discuss scheduling surgery, as he continued to have left knee pain and patellar instability despite wearing his brace and doing exercises. Tr. 354. Dr. Leland reviewed his recent left knee MRI showing an increased tibial tuberosity to trochlear groove measurement and signs of cartilage damage. Tr. 356. They discussed surgery and Trubega advised that Dr. Malone had cleared him to use crutches. Tr. 358.

On January 3, 2019, Trubega had left knee arthroscopy, major synovectomy, trochlear chondroplasty, and open tibial tubercle transfer. Tr. 319-322. Imaging of his left knee on January 15 showed postoperative changes with two stent graded screws traversing on the anterior proximal tibia at the site of osteotomy and intact surgical hardware. Tr. 316. The impression was post-operative changes at the tibial tubercle infrapatellar tendon.

On January 25, 2019, at his second physical therapy visit, Trubega was doing home exercises several times a day and was still using crutches and a left knee brace. Tr. 298. He reported pain and swelling in his left knee. He ambulated with a modified gait with crutches and his left knee brace locked in extension.

By his tenth physical therapy visit, on March 4, 2019, he was permitted to unlock his knee brace. Tr. 287. He reported continued pain in his knee as his sensation was returning. He reported increased pain with exercises, although his left knee range of motion and strength was improving. He demonstrated good quad control when standing and performing his exercises

6

with his brace unlocked, with no weakness or buckling. "He was able to complete today's treatment with ease." The next week he reported having progressed to using a cane "just in case." Tr. 286. He was assessed as being nearly full weight bearing and only using a cane for support. He demonstrated good walking mechanics with his brace unlocked and without an assistive device. He had very good qual control. His response to treatment was listed as improved joint mobility and range of motion, improved strength and gait, and improved knowledge and understanding about his condition.

On March 13, 2019, Trubega had a follow up with Dr. Leland. Tr. 350. He was still using his brace with full range of motion allowed. He complained of superior patella pain that had been present since his prior surgery. He was able to bear weight with a cane. Upon exam, his reflexes and sensation were intact, he had tenderness to palpation, full patellofemoral strength, and his patella was tracking well during range of motion. Tr. 352-353. Dr. Leland stated that Trubega was doing well and that he may come out of the brace and progressively bear weight as tolerated. Tr. 353. He was to follow up in two months.

### C. Opinion Evidence

#### 1. Consultative Examiner

On April 11, 2018, Trubega saw Dr. Bradford, M.D., for a consultative examination. Tr. 273-275. He reported injuring his left knee when he was 13 years old and having four surgeries. He endorsed constant pain even when not weight bearing, he wore a knee brace at all times, and, since his third surgery, he had numbness down his shin into his toes. Upon exam, he had full strength in all his extremities, normal strength in all muscle groups, and intact reflexes. He had decreased range of motion in his left knee and mild suprapatellar effusion. His gait was uneven favoring the right and he wore a left knee brace. Dr. Bradford reviewed his x-rays showing mild

7

patellofemoral arthritis in his left knee with suprapatellar effusion. Dr. Bradford stated, "in my medical opinion, claimant's exam, x-ray and medical records do support his allegation of DJD of the left knee."

### 2. State Agency Reviewing Physicians

On April 16, 2018, state reviewing physician Dr. Siddiqui, M.D., reviewed Trubega's record and opined that he can perform work at the medium exertional level with frequent use of his left lower extremity for foot controls. Tr. 77-78. On July 9, 2018, state reviewing physician Dr. Louis, M.D., adopted Dr. Siddiqui's opinion. Tr. 87-89.

### D. Testimonial Evidence

#### 1. Trubega's Testimony

Trubega was represented by counsel and testified at the administrative hearing. Tr. 59. When asked to describe his symptoms after his knee surgery in June 2016, Trubega stated that he had constant pain, nerve damage, and that his knee will occasionally give out without warning and he will end up on the floor. Tr. 60. His knee pain varied, but at times it felt like "being bitten by 1,000 fire ants to bolt of cold lightening or in some cases just a constant ache that has no relief." Tr. 60. He treats his knee pain and swelling by elevating his leg and using an ice pack. Tr. 60, 61. He is not taking any medication. Tr. 60. He does the exercises that his physical therapist gave him daily. Tr. 60. He also has numbness in certain spots and he can't really feel three of his toes. Tr. 61. He is almost constantly elevating his leg on the couch, as his doctors and therapists have told him to do. Tr. 61.

When asked what his ability to walk was like after his 2016 surgery, Trubega explained that he was in constant pain and his leg would give out without warning. Tr. 62. At the hearing, he was wearing the brace that he was given to relieve the stress on his kneecap. Tr. 62. With the

8

brace, he could walk a little over 100 feet, at a medium pace, by favoring his left leg by staying on his right leg longer. Tr. 62.

When asked whether his January 2019 left knee surgery improved his pain and walking, Trubega answered that his pain was a little bit more than it had been before and that "its always a downhill struggle after winter." Tr. 62. When asked about his left elbow pain after his September 2018 elbow surgery, Trubega stated that he has constant pain no matter what he does, and he has nerve damage so it's hard to feel and use three of his fingers. Tr. 62-63. When asked for a concrete example, Trubega explained that he can't really reach to grab anything, he can't really hold anything, and he can't touch anything really cold for more than two seconds before feeling pain in his elbow. Tr. 63. Since his surgery, he does a little bit of physical therapy to keep his strength up but he has constant pain. Tr. 63. He confirmed that he is right-handed. Tr. 63.

Trubega stated that he lives in a house with his parents and his grandmother. Tr. 63. He helps with the occasional thing that he can do but there are some things he is not able to do anymore. Tr. 63. For instance, he is unable to dust and wash dishes, and he has difficulty doing his laundry. Tr. 64. Doing dishes is difficult when he uses two hands to pick up a heavier dish or to try and dry it. Tr. 64. Laundry is difficult due to having to reach in, move anything, or carry anything that is too heavy or bulky. Tr. 64. When asked how he manages stairs, Trubega explained that he uses the handrail to anchor himself and pulls or lowers himself along. Tr. 64. He also has a handrail in his shower so he has something to grab onto so he doesn't fall. Tr. 64. When he sleeps at night he is constantly tossing and turning, sometimes sleeping for 30 to 45 minutes at a time before having to reposition, and then maybe not falling asleep for another 30 minutes while he tries to find a good position to sleep in. Tr. 64.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 65-68. The ALJ asked the VE to determine whether a hypothetical individual of Trubega's age, education, and lack of vocational profile could perform work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below. The VE answered that such an individual could perform the following jobs with significant numbers in the national economy: cafeteria attendant, ticket seller, and furniture rental clerk. Tr. 66.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

>
> severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his June 25, 2019, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since February 6, 2018, the application date. Tr. 39.

2. The claimant has the following severe impairments: mild patellofemoral arthritis of the left knee, status post ligament reconstruction; cubital tunnel syndrome of the left elbow, status post debridement, and repair and nerve transportation; and obesity. Tr. 39.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 39.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

11

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and up to frequent reaching with the nondominant left arm, but no limitation of the dominant right arm. Tr. 40.

5. The claimant has no past relevant work. Tr. 45.

6. The claimant was born in 1992 and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 45.

7. The claimant has at least a high school education and is able to communicate in English. Tr. 45.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 45.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 45.

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 6, 2018, the date the application was filed. Tr. 46.

### V. Plaintiff's Arguments

Trubega argues that the ALJ erred at step three and when assessing Trubega's statements regarding his symptoms. Doc. 12.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at step three

At step three of the disability evaluation process, a claimant will be found disabled if his impairment(s) meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that his condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). Thus, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 Fed. App'x at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to meet the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. 2011) (internal quotation marks omitted).

Trubega argues that the ALJ erred in his analysis of Listing 1.02. Doc. 12, p. 8. Listing 1.02, Major dysfunction of a joint(s) (due to any cause), is, in pertinent part,

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

13

20 C.F.R. Part 404, Subpart P, Appendix 1.[2]  Section 1.00B2b defines the ability to ambulate effectively as follows:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*.

> At step three, the ALJ explained,
>
> The undersigned considered the claimant's dysfunction of major joints under listings 1.02 and 11.14 [peripheral neuropathy] of the Regulations and finds that they do not meet or equal a listing.  As discussed in more detail below, the evidence does not support a gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion that results in the inability [to] perform fine and gross motor movements effectively, as defined in 1.00(B)(2)(c), or to ambulate effectively, as defined in 1.00(B)(2)(b).  Additionally, there is no evidence of disorganization of motor function that results in an extreme limitation, as defined in 11.00(D)(2), in the ability to use the upper extremities.

Tr. 39-40.  Elsewhere in his decision, the ALJ detailed Trubega's treatment and observed that, after his recent surgery, he had an improved gait, strength, range of motion, and he was weight bearing with a cane.  Tr. 43.

Trubega argues that the ALJ's analysis of Listing 1.02 is "vague, inaccurate and certainly not sufficient to withstand scrutiny."  Doc. 12, p. 9.  He argues that the record is replete with references to pain, weakness, tenderness, etc., and the inability to ambulate effectively. Doc. 12, p. 9.  He criticizes the ALJ's step three analysis because there are no citations to the

---

[2] Trubega limits his challenge to the ALJ's analysis of Listing 1.02 to impairments involving his leg.  See Doc. 12, pp. 8-10.  Therefore, the undersigned limits the discussion of Listing 1.02 to that impairment.

14

record. Doc. 12, p. 10.

First, the fact that the ALJ did not cite the record at step three is not error because, elsewhere in his decision, the ALJ provided ample record citation. *Beldsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) (ALJ did not err when he failed to spell out every consideration that went into a step three analysis when the ALJ described pertinent evidence elsewhere in the decision).

Regarding the ability to ambulate effectively, Trubega does not identify evidence that he was unable to ambulate effectively. *Thacker*, 93 Fed. App'x at 727-728 (The claimant bears the burden of establishing that his condition meets or equals a listing). In support of his assertion that he has "significant difficulty ambulating," Trubega argues that he has patellar instability "which limits walking, bending, and kneeling," and cites the record at Tr. 226, 243, and 287. Doc. 12, p. 9. Those cited records do not show he has an inability to ambulate effectively. The record at Tr. 243 is from May 2016, wherein he did show patellar instability but, subsequently, he had surgery to correct it. Indeed, the record at Tr. 226 is from September 2016, at his three-month follow-up appointment post-surgery, wherein he stated that he was doing well and reported improvement. Upon exam, he did not have patellar instability. Tr. 228. And the record at Tr. 287 is a physical therapy note from March 2019, after his January 2019 surgery, wherein he performed his exercises with his knee brace unlocked, his left knee strength and range of motion were observed to be improving, he demonstrated good quad control when standing, and he had no episodes of weakness or buckling. Trubega's statement about his limitations do not show he is unable to ambulate effectively as described in 1.00B2b, and, in any event, the ALJ did not fully credit his statements, as discussed in detail below.

In short, Trubega has not shown that he is unable to ambulate effectively. The ALJ did

15

not err at step three. *See Thacker*, 93 F. App'x at 728 (finding that the ALJ did not err when considering whether the claimant's impairments met or equaled Listing 1.02A because he did not show that he was unable to ambulate effectively; a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency.").

### B. The ALJ did not err when he considered Trubega's statements regarding his symptoms

Trubega argues that the ALJ ran afoul of SSR 16-3p when evaluating Trubega's statements regarding his symptoms. Doc. 12, p. 10. A claimant's statements of pain or other symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304. When a claimant alleges impairment-related symptoms, a two-step process is used to evaluate those symptoms. 20 C.F.R. § 404.1529(c); 2017 WL 5180304, *2-8. First, a determination is made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, e.g., pain. *Id*., *3-4. Second, once the foregoing is demonstrated, an evaluation of the intensity and persistence of the claimant's symptoms is necessary to determine the extent to which the symptoms limit the claimant's ability to perform work-related activities. *Id*. at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id*. In addition to this evidence, the factors set forth in 20 C.F.R. 404.1529(c)(3) are considered: daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or

16

other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, e.g., lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. *Id*. at *7-8. The ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *10.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. App'x 370, 371 (6th Cir. 2011) (citing *Walters*, 127 F.3d at 531).

Here, the ALJ detailed Trubega's statements regarding his symptoms, including: constant pain and nerve damage in his left leg, his leg gave out on him, constant left leg swelling requiring him to elevate it constantly, and increased pain following his January 2019 knee surgery. Tr. 41. He stated that he could walk for no more than 50 feet without needing to rest for a few minutes and he had limitations with lifting, squatting, standing, reaching, sitting, kneeling, and climbing stairs. Finally, he stated that he had constant left elbow pain due to nerve damage and it was difficult to feel and use his fingers.

After discussing Trubega's history of knee and elbow impairments, including his historical surgeries; the consultative exam performed by Dr. Bradford; his treatment (recent surgeries, physical therapy); and his objective exam findings and imaging results (Tr. 41-43), the ALJ concluded,

17

> The record supports that the claimant experienced limiting signs and symptoms associated with his severe impairments. He has a history of multiple surgeries on his left knee, to include left knee arthroscopic MPFL reconstruction in June 2016. Imaging of his knee as of the alleged onset date showed mild patellofemoral arthritis and prior tunnels of MPFL reconstruction. Significant associated clinical findings included decreased range of motion of the left knee with pain, mild suprapatellar effusion, an uneven gait favoring the right, tenderness to palpation about the entire patella, focal tenderness over the lateral trochlear grove, positive patellar grind and apprehension, and a stretched or torn MPFL tendon. Accordingly, surgical intervention followed by physical therapy were found warranted. Imaging of the claimant's left elbow showed medial epicondyle nonunion, and a well-corticated bony fragment in the origin of the flexor pronator mass with the ulnar nerve sitting adjacent to the bony lesion. Related objective findings include decreased range of motion in his left elbow and wrist, subjective numbness, notable weakness with finger flexion strength, tenderness to palpation of the medial epicondyle, a positive Tinel sign over the ulnar nerve at the cubital tunnel, and diminished sensation in the ulnar aspect of the hand. Surgical intervention was deemed warranted. Finally, the claimant's weight was within the obese range.
>
> However, the claimant's statements about the intensity, persistence, and limited effects of his symptoms are inconsistent because the level of limitation alleged is not altogether supported by the objective findings. The record contains findings of intact strength in all muscle groups as well as full and painless range of motion of the left elbow with no signs of instability. He demonstrated good grip strength even prior to surgery, and was able to pick up a coin, key, write, hold a cup, open a jar, button/unbutton, zipper, and to open a door with no difficulty. The claimant demonstrated improved pain, range of motion, strength, and gait with physical therapy subsequent to his left knee surgery. In fact, he was assessed as nearly fully weight bearing by March 7, 2019. Further, the surgeon who performed his left elbow surgery cleared the claimant to use crutches prior to his left knee surgery, supporting improved strength, pain, and functioning of the left upper extremity.

Tr. 43-44 (record citations omitted).

Trubega complains that the ALJ did not address his daily activities (i.e., the chores he has difficulty doing) or his complaints of pain. Doc. 12, p. 13. But the ALJ discussed Trubega's complaints of pain, both in the section of his decision quoted above and in the balance of the ALJ's decision. See Tr. 41 (the ALJ detailing Trubega's statements at the hearing regarding his pain; his reports of constant pain to Dr. Bradford at his consultative exam in 2018; his reports of pain to Dr. Leland), 42 (the ALJ stating that Trubega was given an oxycodone-acetaminophen prescription for pain management and noting the findings of left knee pain and weakness at a

18

physical therapy assessment), 43 (the ALJ remarking that Trubega's pain improved after his January 2019 surgery and that, thereafter, he reported increased pain with greater use of his left leg, including when fully weight bearing, walking with his knee brace unlocked, and ambulating without the use of an assistive device).

Next, while the ALJ did not specifically address Trubega's reports of chores he had difficulty doing around the house, the ALJ's failure to mention those chores in his decision does not mean that he did not consider them. *See, e.g., Ellis v. Comm'r of Soc. Sec.*, 2021 WL 822497, at *3 (E.D. Mich. Mar. 4, 2021) ("This Court has repeatedly held that the ALJ is not required to explicitly address every one of these factors in order to have sufficiently 'considered' the record." (collecting cases)). Furthermore, Trubega alleges that he testified that "his knee keeps him from dusting, doing dishes or laundry." Doc. 12, p. 13 (citing Tr. 64). But Trubega did not testify that his knee impairment prevented him from dusting, doing dishes, or laundry. Rather, Trubega stated that he had difficulty doing dishes when he had to use two hands to pick up a heavy dish. He did not explain why he had difficulty dusting. And he testified that laundry was difficult for him due to "reaching in, moving anything, carrying anything that is heavy weight or too bulky." Tr. 64. Thus, it is not apparent from his testimony that it is his knee, rather than his elbow impairment, which makes those chores difficult for him.

Finally, Trubega asserts that the ALJ did not properly evaluate activities that aggravate his pain, including that he "cannot bend or kneel due to his symptoms." Doc. 12, p. 13. The only records he cites showing that he experiences pain when he bends or kneels are from May and early June 2016, wherein he also experienced knee instability prior to his subsequent knee surgery on June 23, 2016. Doc. 12, p. 2 (citing Tr. 235, 239). In any event, the ALJ remarked that Trubega endorsed limitations when lifting, squatting, standing, reaching, sitting, kneeling,

19

and climbing stairs[3] (Tr. 41) and that he showed limited tolerance while standing during a physical therapy evaluation in 2018 (Tr. 42). However, the ALJ remarked that Trubega showed improvement after his 2019 knee surgery. Tr. 44. And the ALJ explained that he limited Trubega to light work and occasionally climbing ramps and stairs to avoid exacerbating his knee pain; no climbing of ladders, ropes or scaffolds and occasionally balancing due to reports of his left knee giving out and weakness; and additional postural limitations (occasionally balance, stoop, kneel, crouch, crawl, climb) based on his reports of his leg giving out, weakness, and range of motion in his knee, and the effects of his weight on his ability to maneuver. Tr. 44. In short, the ALJ did not err when he considered Trubega's statements regarding his symptoms.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: March 15, 2021

/s/Kathleen B. Burke

Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[3] The ALJ cited Trubega's function report from March 2018, in which he did not indicate that he had limitations bending. Tr. 41, 184.